UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| **Theresa Amadeo; Lucretia Dodson; Vivian Dunn; Sharon Estep; John Justice; Janice McKenzie; Rebecca Price; Patty Varnado; Brenda Wheeler; Tamara Wolters,**<br>         Plaintiffs<br><br>v.<br><br>**Indevus Pharmaceuticals, Inc., F/K/A Interneuron Pharmaceuticals, Inc.; Wyeth, Inc., F/K/A American Home Products Corporation; Wyeth Pharmaceuticals, Inc F/K/A Wyeth-Ayerst Pharmaceuticals, Inc., A Division Of American Home Products Corporation; and Boehringer Ingelheim Pharmaceuticals, Inc.,**<br>         Defendants | **CIVIL ACTION<br>NO. 04cv11039** |

### **PLAINTIFFS' CONSOLIDATED MEMORANDUM IN SUPPORT OF THEIR MOTION TO REMAND IN THIS CASE AND OTHER DIET DRUG CASES REMOVED TO THIS COURT**[1]

### **BACKGROUND**

Plaintiffs filed complaints in Massachusetts Superior Court, Middlesex County, against the defendant, Indevus Pharmaceuticals, Inc., f/k/a Interneuron Pharmaceuticals, Inc.("Indevus"), a Massachusetts company that designed and marketed the diet drug dexfenfluramine ("Redux"). The complaints also name as defendants Wyeth, Inc., Wyeth Pharmaceuticals, Inc. (collectively referred to as "Wyeth"); and Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer"). *See for example*, Ex. 1, *Amadeo* Complaint. Plaintiffs seek to recover damages for valvular heart disease ("VHD") and associated injuries caused by their ingestion of Redux.

---

[1] Pursuant to a joint stipulation filed today, this serves as a memorandum for all diet drug cases originally filed in Middlesex Superior Court by Sugarman, Rogers, Barshak and Cohen, P.C. and subsequently removed to this Court.

Wyeth recently removed these actions from Middlesex Superior Court to this Court on the purported ground that Indevus was a "sham" defendant that was fraudulently joined in order to preclude federal jurisdiction over this case. However, the real purpose of Wyeth's removal is to gain a tactical advantage by attempting to obtain a stay of proceedings and, ultimately, to have the actions transferred to the MDL court. Because Indevus is a proper defendant, and because Wyeth cannot satisfy the stringent burden required to prove fraudulent joinder, these cases should be remanded to the Massachusetts Superior Court, plaintiffs' forum of choice.

**1. The Massachusetts Consolidated Actions.**

Subsequent to the filing of *Linnen v. A.H. Robins, et al.*, Middlesex County, No. 97-2307, hundreds of diet drug cases were filed against Indevus in courts throughout Massachusetts. These were collectively known as "Fen-Phen 1." By April 6, 2000, as a result of the large volume of pending diet drug cases, and by agreement between plaintiffs and defendants, Indevus and Wyeth, the Honorable Raymond J. Brassard, acting as Supervising Judge, entered a Stipulated Pre-Trial Order establishing *In re Massachusetts State Court Diet Drug Litigation*, Case No.: 98-5255 A, a consolidated docket for both pre-trial procedures, and trial over such cases. *See* Ex. 2, PTO #2. Plaintiffs' cases were consolidated with other diet drug cases before Judge Brassard.

During the pendency of the consolidated diet drug proceedings in Massachusetts, Wyeth filed cross claims against Indevus, seeking contractual and common-law indemnity against Indevus for any and all injuries sustained by the various plaintiffs. *See* Ex. 3, *In Re Diet Drug Litigation* Docket, at 11-12. By doing so, Wyeth contended, contrary to its present position, that Indevus is, indeed a proper defendant.

2

In another action involving opt-out plaintiffs, *Sawyer v. Indevus Pharmaceuticals* (Civil Action No. 03-5028-B), Indevus, with Wyeth as amicus curiae, has presented extensive memoranda contending, as Wyeth does here, that plaintiffs' claims are barred by the statute of limitations. The matter was argued before Judge Brassard, on June 16, 2004, where he indicated a decision would be rendered expeditiously. Notably, Wyeth's argument for removal here is virtually identical to Indevus's argument for summary judgment in *Sawyer*. *See* Ex. 4, Indevus's memorandum of law in *Sawyer*.

**2. Plaintiffs Allegations Against Indevus.**

Wyeth opens its Notice of Removal with a lengthy – but irrelevant - effort to tar this action by recounting a selective history of other diet drug litigation in various parts of the country. Whatever the merits may have been of naming peripheral defendants in other cases, Wyeth acknowledges that Indevus played a central role in the developing and marketing of Redux. In addition, Indevus itself has admitted that it had obtained the license to manufacture and sell Redux in the United States, and that it sponsored the application to the FDA for approval of the use of Redux as a diet drug. *See* Ex. 4, Indevus's memorandum of law in *Sawyer*, p. 1.

Plaintiffs allege that Redux, developed by Indevus as an appetite suppressant, caused countless users, including plaintiffs, to sustain serious and sometimes fatal injuries including VHD. More specifically, plaintiffs allege that Indevus manufactured and marketed a dangerously defective drug and withheld, mischaracterized, and actively misrepresented reports and information in its possession which directly related to the risk of developing VHD and PPH. *See* Ex. 1, *Amadeo* Complaint, at ¶¶ 89-117. Plaintiffs' complaint also describes the facts

underlying their claims against Indevus in extensive detail. *Id.* at ¶¶ 12-88.[2] Under these circumstances, any assertion that plaintiffs do not intend to fully litigate this claim against Indevus is meritless.

### 3. The National Class Action Settlement.

Redux was removed from sale in the United States on September 15, 1997, following publication of research which disclosed the high incidence of VHD and PPH suffered by consumers of the drug. Litigation against those responsible for this catastrophic sequence of events took place throughout the United States, including the Massachusetts Superior Court. In December of 1997, the Judicial Panel for Multidistrict Litigation transferred all the federal diet drug actions to the United States District Court for the District of Pennsylvania, creating Multidistrict Litigation 1203.

Wyeth began global settlement negotiations and the parties reached a tentative settlement agreement for a nationwide class. On August 28, 2000, the MDL court entered a final order certifying the class and approving the settlement. Under the terms of the settlement agreement, class members agreed to release Wyeth with the proviso that they were given "opt-out" rights at several points in time. This allowed class members who were initially asymptomatic to opt out at a later stage and pursue their claims against Wyeth in any otherwise proper forum once an "FDA Positive" injury manifested itself by way of an echocardiogram. In exchange for the agreement by the opt-out plaintiffs not to pursue claims of punitive or multiple damages, Wyeth agreed not to assert statute of limitations defenses against these individual claimants. A comprehensive history of the class action litigation is given in *In Re Diet Drugs,* 369 F.3d 293 (3rd Cir. 2004).

---

[2] The complaints in all the removed actions contain substantially the same allegations, albeit with occasional different paragraph numbers.

Plaintiffs exercised their opt-out rights under the class settlement by filing this action after they were diagnosed with VHD within the last three years. Plaintiffs allege that they diligently attempted to discover any injury caused by their ingestion of the diet drugs by following the advice of their physicians. They did not discover their injuries until they had an echocardiogram which showed the presence of VHD. *See* Ex. 1, *Amadeo* Complaint ¶¶ 5-7. Nevertheless, Wyeth asserts that these claims are untimely with respect to the claims against Indevus, a Massachusetts defendant, which, unlike Wyeth, is not precluded from raising the statute of limitations defense.

## ARGUMENT

**1. Fraudulent Joinder Standard.**

Actions can be removed from state to federal court "only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b). When a resident party such as Indevus has been joined as a defendant, the party invoking removal jurisdiction of the federal courts bears a heavy burden. The removal statute must be strictly construed against removal and all doubts should be resolved in favor of remand. *See Danca v. Private Health Care Sys., Inc.,* 185 F.3d 1, 4 (1st Cir. 1999) citing *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108-109 (1941). This is consistent with the trend to limit removal jurisdiction. *See Getty Oil Corp. v. Insurance Co. of N. Am.,* 841 F.2d 1254, 1263 n.13 (5th Cir. 1988).

Under this rigorous standard, joinder is considered fraudulent only when there is *no possibility* that the plaintiff can prove a cause of action against the resident defendant. *Fabiano Shoe Company, Inc. v. Black Diamond Equipment, Ltd.,* 41 F. Supp. 2d 70, 71 (D.Mass. 1999), citing *Triggs v. John Crump Toyota, Inc.,* 154 F. 3d 1284, 1287 (11th Cir. 1998); *Burden v.*

5

*General Dynamics Corp.,* 60 F. 3d 213, 216 (5th Cir. 1995). "The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a *possibility* of stating a valid cause of action in order for the joinder to be legitimate." *Fabiano, supra,* at 71-72 (emphasis in original).

Wyeth cannot succeed in its removal effort unless it can show "by clear and convincing evidence, either that outright fraud has been committed in the plaintiff's pleadings, *or* that there is no possibility, based on the pleadings, that the plaintiff can state a cause of action against the non-diverse defendant in state court." *Mills v. Allegiance Healthcare Corp.,* 178 F. Supp. 2d 1, 5 (D.Mass. 2001), citing *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 207 (2nd Cir. 2001). Thus, in order to remand this case, plaintiffs need only establish that one claim is colorable against Indevus. This is a level of scrutiny even less searching than when a party seeks to dismiss a claim under Fed. R. Civ. P. 12(b)(6). *Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 852 (3rd Cir. 1992). As long as any of plaintiffs' claims are not insubstantial or frivolous, this case must be remanded. *Id.* at 853; *see also C. Pappas Co., Inc. v. E.J. Gallo Winery,* 1984 WL 2930 at * 3 (D. Mass. 1984) ("It is immaterial that joinder is intended to defeat federal jurisdiction as long as there exists a good faith claim against the nondiverse defendant"), citing *McAllister v. Chesapeake & O. Ry. Co.,* 243 U. S. 302 (1917).

Rather than rely upon its amicus brief in *Sawyer,* Wyeth improperly invokes federal jurisdiction over a resident defendant. This exceeds the proper use of the removal statute and should not be countenanced. "Perhaps they should be given credit for their ingenuity, but it should not surprise them that a federal court, careful of its diversity jurisdiction, is, in the circumstances, unwilling to indulge the masquerade." *Mill-Bern Associates, Inc. v. Dallas Semiconductor Corp.*, 69 F. Supp. 2d 240, 246 (D.Mass. 1999); *see also Duffin v. Honeywell*

*Int'l, Inc.*, 312 F.Supp.2d 869, 874 (N.D. Miss. 2004) (recognizing that removal litigation in the context of a motion to stay pending transfer to an MDL "generally has less to do with effecting valid removals than with attempting to obtain a transfer of the case to a multi-district litigation (MDL) court, where the case generally languishes for a protracted period of time. While the desire of defendants to reach the comparative safety of an MDL court is understandable, their repeated efforts to do so, regardless of the jurisdictional merits, has resulted in an air of skepticism among the federal courts . . .").

**2. The Massachusetts Discovery Rule Precludes Removal In This Case.**

The sole basis for Wyeth's removal of this action is its unsubstantiated assertion that the applicable statute of limitations in this action has expired as to Indevus. However, as Wyeth is forced to acknowledge, Massachusetts has adopted a discovery rule that delays the running of the statute of limitations until the plaintiff learns that she has been harmed by the defendant's conduct: "Where injury is present but not discernible, or an injury is recognized but its cause is not ascertainable, accrual of the cause of action is held to be in abeyance until the time when a modicum of knowledge supplants ignorance in the mind of the claimant, or may be reasonably imputed to her." *Lioji v. Mass. Bay Transportation Auth.,* 28 Mass. App. Ct. 926 (1990).

In paragraph 6 of the complaint, plaintiffs allege that they acted diligently in attempting to discover any injury caused by the ingestion of Redux, including following the advice of their physicians, and that they could not reasonably have discovered their injury until they had an echocardiogram showing VHD. *See* Exhibit 1, *Amadeo* Complaint. On its face, this allegation is sufficient to survive a 12(b)(6) motion. "[T]he question when a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact." *Riley v. Presnell,* 409 Mass. 239, 240 (1991). Wyeth fails to offer any evidence to rebut

7

these allegations. For this reason alone, removal was improper. In addition as argued below, Wyeth has failed to present any evidence to demonstrate, as they must to sustain this removal, that every reasonable person who ingested Redux necessarily would have obtained an echocardiogram more than three years (or four years for plaintiffs' chapter 93A claims) prior to the filing of a complaint.

### a. Wyeth Misstates the Discovery Rule.

In order to avoid the consequences of plaintiffs' reasonable conduct prior to the discovery of their injuries, Wyeth mischaracterizes the discovery rule as triggering the statute of limitations when a plaintiff "knows she **may** have been harmed." Notice of Removal, ¶ 13 (emphasis added). However, knowledge of *possible* harm is not the test. The actual language in the cited case is: "we do require that a plaintiff have (1) **knowledge or sufficient notice that she was harmed** and (2) knowledge or sufficient notice of what the cause of harm was." *Bowen v. Eli Lilly & Co., Inc.,* 408 Mass. 204, 208 (1990) (emphasis added). Indeed, the Supreme Judicial Court explained that so-called inquiry notice only arises in factual scenarios which are the opposite of those presented here. This is because the inquiry as to the *cause* of harm is only at issue for limitations purposes if the plaintiff is already aware of the harm itself:

> This case presents an aspect of the discovery rule with which this court has not previously been confronted. **Our prior cases have focused on the question whether, in given circumstances, the plaintiffs should reasonably have discovered that they had been harmed.** In each of these cases, there was no significant doubt concerning the cause of the harm once the plaintiffs discovered it. **In this case, on the other hand, the plaintiff was always well aware that she had sustained substantial physical harm.** The question is whether she was sufficiently on notice as to the cause of her physical harm.

*Id.* (emphasis added). In *Bowen,* the plaintiff was aware of her injury for 14 years before filing suit. For this reason, the Supreme Judicial Court focused upon the second prong of the

8

discovery rule – whether the plaintiff had reasonable notice of the *cause* of the harm. Unlike in *Bowen* and related cases, plaintiffs here were not aware of their injuries until recently and, hence, the *Bowen* analysis does not apply.

The courts have been particularly averse to requiring that plaintiffs file suit before the nature of their harm has become clear. "Not only does it offend fairness to require of claimants the gift of prophecy … but it is unsound judicial policy to encourage the initiation of law suits in anticipation that a grave disease will manifest itself pendente lite." *Gore v. Daniel O'Connell's Sons, Inc.*, 17 Mass. App. Ct. 645, 648 (1984). In its Notice of Removal, Wyeth runs afoul of this cautionary directive by asking this Court to impose upon plaintiffs a standard that would require that they file suit before being aware that they had suffered appreciable harm. For good reason, that is not the law in Massachusetts.

### b.  Latency of Injury is <u>Irrelevant</u> under Massachusetts Law.

Since Wyeth cannot succeed on the salient issue of when the plaintiffs should have discovered their injuries in the exercise of reasonable diligence, it focuses upon what it argues is the non-latent nature of the injuries. This approach is incorrect for two reasons. First, it is not a relevant consideration under the discovery rule. Second, Wyeth relies upon an improper factual source for its latency argument.

Contrary to Wyeth's implication, the inquiry under the Massachusetts discovery rule is not when the injury occurred, but rather when the injury *could reasonably have been discovered* by the plaintiff. Wyeth's contention that VHD is not a latent injury simply has no bearing on that inquiry. Indeed, Wyeth has made similar contentions in other cases, to no avail. *See, e.g., Dykes v. Reeves*, at 6-7, No. 2:03CV121PG (S.D. Miss. Nov. 6, 2003) (Ex. 5). The *Dykes* Court explained:

9

> Defendants strongly argue that the MDL litigation has determined that valvular heart disease is not a latent disease and as such the parties in this case are bound by such finding.  The fallacy of Defendant's argument in this regard is that the issue is not whether or not the condition is latent, but whether . . . the condition should have been found with "reasonable diligence."  That is the issue.  The issue is not whether or not the condition is latent.  Whether Plaintiff should have discovered her condition prior to June 21, 2000, is a fact question.

As argued in more detail in plaintiffs' opposition to Indevus's motion for summary judgment in *Sawyer*, VHD may be asymptomatic until long after the ingestion of Redux, even as harm may be occurring.  *See* Ex. 6, Plaintiffs' Opposition at 11-15.[3]  Plaintiffs have alleged, and Wyeth has failed to come forward with any evidence to dispute, that they followed the advice of their doctors to determine whether they had been harmed by the ingestion of Redux.  Under Massachusetts law, that is sufficient to postpone the accrual of plaintiffs' cause of action until the injury was actually discovered, regardless of whether or not the injury was or was not latent.

**c.  Under Massachusetts Law, the Issue is one of Reasonable Diligence, not Latency.**

In order to sustain its heavy burden of proving fraudulent joinder, Wyeth must prove, as a matter of law, that each and every plaintiff herein failed to act diligently to discover their injury.  Even if we assume that the conflicting media reports and repeated denials of causation and

---

[3] Diet drug induced valvular heart disease is a pathological disease process which begins at the cellular level, and progresses to the point of causing regurgitation, which may be clinically insignificant and asymptomatic.  Even serious diet drug induced valve disease may not be detectable by physical examination, auscultation, and echocardiography.  *See* Ex. 15, Aff. of George K. Massing, M.D. at ¶ 2; Ex. 6, Plaintiffs' Opposition in *Sawyer*.  That is consistent with Judge Bechtle's finding in PTO 1415 that diet drug users' claims were not uniformly time-barred because their injuries (1) may be asymptomatic and, therefore, not discoverable until some later date, and (2) not actionable until they progress to a more serious level in the future.  *See* Ex. 16, PTO 1415 at *18.  Significantly, even while stating that the (pathological) "lesions" may not be latent, Judge Bechtel recognized that Wyeth would only have an "argument" that class members should have discovered their injuries earlier.  *Id*.  Had Judge Bechtel intended to issue a finding that would preclude plaintiffs from relying upon the discovery rule, he would have said so.  Instead, while recognizing that the waiver of the statute of limitations by Wyeth would benefit a small minority of class members such as those described in ¶3, Judge Bechtel specifically recognized that many states that would apply the discovery rule, would not apply a time bar at all to class members claims.  *Id*.  Certainly, there is no doubt that the Massachusetts courts falls within those courts described in ¶¶ 1 and 2.

liability by the defendants sparked a duty of inquiry, that did not mean that plaintiffs were required, in the exercise of reasonable diligence, to obtain an echocardiogram.

This point is crucial, and fatal to Wyeth's claims of fraudulent joinder. As discussed below, the overwhelming focus of medical advice to those exposed to diet drugs was to consult with a doctor, not to obtain an echocardiogram. That is because the test required to diagnose valvular heart disease - an echocardiogram - was not required for any, and not even medically indicated for many, diet drug users, *see* Ex. 7, Depo. of Lawrence Cohen, M.D at 155 & 159, and Ex. 8, Cohen Report at ¶ 26 (Dr. Cohen, Wyeth's expert witness, testified that **"where a patient has presented with a history of exposure to fenfluramine, Redux, Pondimin, that that doctor should <u>not</u> send that patient out for an echocardiogram. . . . .It's not good medicine."**); Ex. 9, *ACC/AHA Practice Guidelines for the Clinical Application of Echocardiography,* at pp. 1692 ("Because the finding of clinically silent valvular regurgitation in an asymptomatic patient carries an unknown significance, performance of Doppler echocardiography to exclude valvular heart disease . . . is not indicated.").

Because the onset of injury associated with diet drugs is asymptomatic, people exposed to Redux were directed to consult with their physicians to investigate whether they had been harmed. That direction was consistent throughout all of the various information channels that Wyeth claims alerted the plaintiffs to the possibility of an injury associated with the diet drugs. *See*, *e.g.,* Ex. 10, *DHHS Interim Recommendation for Patients Exposed to Fenfluramine and Dexfenfluramine* (Nov. 13, 1997); Ex. 11, *ACC/AHA Guidelines for the Management of Patients with Valvular Abnormalities: A Report to the American College of Cardiology/American Heart Association Task Force on Practice Guidelines*, 32 Am. J. Cardiol. 1486. Equally important, however, is the fact that these same sources of information repeatedly and consistently instructed

diet drug users that they did not need an echocardiogram unless their physician directed them to get one, and that physicians must use their medical judgment before prescribing such a costly medical procedure. Ex. 12, Affidavit of Bridgette Hampton, M.D. at ¶ 7 ("The standard of care in the medical community for treating patients who formerly ingested [diet drugs] has never been to automatically refer those patients for an echocardiogram.").

Indeed, Wyeth has previously argued this very point, i.e. that diet drug users did not, in the exercise of reasonable diligence, need to obtain an echocardiogram unless their physician instructed them to get one. *See* Memo of AHP Corp. in Opposition to Plaintiffs' Motion for Class Cert. at 31-32, excerpts attached hereto as Ex.13, ("However, as even plaintiffs' experts have acknowledged, those agencies and medical groups have in fact recommended only that prior users of the drugs receive individualized examination by their personal physicians. No group has advocated echocardiograms or other 'standardized' testing for everyone who took the drugs. . . . In other words, physicians should do what they ordinarily do – evaluate each patient, his or her symptoms, and his or her medical history, and make an individualized determination about treatment or testing.").

Thus, Wyeth not only agrees with plaintiffs' position on this all important issue, but has gone so far as to advocate these facts to the MDL Court. Indeed, Wyeth explains that "both the DHHS and the ACC/AHA recommendations make plain that the ultimate decision as to whether or not to have an echocardiogram should rest with the physician, based on his or her evaluation of each individual patient. . . . Such factors cannot be assessed wholesale in one huge class action." *Id.* at 59.

Nothing in the class action notice or in the media campaign relied upon by Wyeth is inconsistent with the prevailing view that it was not medically appropriate for everyone who took

diet drugs to obtain an echocardiogram.  In fact, Indevus, in its Rule 9(b)(5) Statement of Facts in support of its motion for summary judgment in *Sawyer*, admitted five times that the only duty of inquiry was for plaintiffs to see their physician.  *See* Ex.14, at ¶¶ 26, 28, 29, 31, 32.

Under Massachusetts law, plaintiffs' reliance upon the professional judgment of their physicians in not obtaining an echocardiogram, as well as the advice of the U.S. Government, and all major medical societies, shows that there is a more than colorable claim that the suits against Indevus are timely filed.  *See Zamboni v. Aladan Corp.,* 304 F. Supp. 2d 218, 226 (D. Mass. 2004) (holding that plaintiff's reliance upon diagnosis of physicians created issue of fact precluding summary judgment on grounds of discovery rule); *Lindsay v. Romano*, 427 Mass. 771, 775 (1998) (holding that plaintiff reasonably relied on numerous medical opinions that failed to establish link between defendant's conduct and plaintiff's injury); and *Castillo v. Massachusetts General Hospital,* 38 Mass. App. Ct. 513, 516 (1995) (holding that there was no basis for concluding that reasonable person would have discovered harm until physician interpreted his medical test results).

Because there is no dispute that plaintiffs did consult with their doctors following their use of diet drugs, and because Wyeth itself has previously conceded that following such a course was reasonable, there is no basis for asserting fraudulent joinder.

In these cases, Wyeth has failed to present any evidence that even <u>one</u> of the plaintiffs failed to visit her physician to obtain an evaluation following her use of diet drugs, and certainly in no way has it met its burden of demonstrating that plaintiffs have no possibility of demonstrating their own diligence.  So too, has Wyeth failed to present any support for the proposition that such a visit would have resulted in an echocardiogram that necessarily would

13

have revealed FDA positive heart valve disease.[4] It is noteworthy that Wyeth does not suggest that the plaintiffs' physicians' initial failure to discover valvular heart disease through auscultation, and their decision not to order an echocardiogram, was an unreasonable exercise of their professional judgment.

### d. Wyeth's Reliance On Court Findings On Latency Is Impermissible.

As thoroughly explained above, the issue of latency is irrelevant to this Court's analysis. In any event, Wyeth cannot rely upon the MDL's finding on latency. The core of Wyeth's statute of limitations argument is based upon Pretrial Order 1415, 2000 WL 1222042 (E.D. Pa. 2000), which was drafted for the purpose of certifying and approving a nationwide settlement of the diet drug class action litigation. *See* Pretrial Order 1415 attached hereto as Ex. 16. In the course of its memorandum, the MDL court made certain findings with respect to the latency of injuries caused by the ingestion of diet drugs. Those findings were subsequently relied upon by the successor MDL judge in a series of cases that Wyeth has attached to its Notice of Removal.

Wyeth's reliance upon the factual findings of the MDL court with regard to latency is in violation of the settlement agreement. As the Court of Appeals for the Third Circuit recently held, the settlement agreement to which Wyeth was a party contained a provision that precluded any party in an unrelated judicial proceeding from relying upon any finding of fact made by the MDL court for the purpose of effectuating the settlement:

---

[4] If there was any doubt that Wyeth simply cannot meets its burden of proving that, as a matter of law, everyone who saw their physician, necessarily would have discovered their injury, plaintiffs would direct the court to the affidavits filed by the plaintiffs in the Andrus case. *See Exs*. 17-19, Affidavits of Nancy Kennedy, Laurel Fankhauser and Diane Bonneau, in which they each aver that they saw physicians every year from 1996 until 2001 for regular checkups during which their physician or health care practitioner would determine whether or not there was any heart damage. Plaintiffs would further direct the Court's attention to the affidavits filed by the plaintiffs in the *Sawyer* case. *See* Ex. 17-19. It was only in 2001 or 2002, when an echocardiogram was performed, that they learned of their injuries. Although such affidavit evidence is unnecessary to defeat the removal of this action, the absence of any particularized contrary evidence from Wyeth is striking. Should the Court require, plaintiffs can and will submit similar affidavits demonstrating that their visits to their physicians also failed to reveal their injuries, even on auscultation, and that their physicians, hearing no heart murmurs, did not prescribe an echocardiogram.

> Section VIII.F.3 [of the settlement agreement] provides:
>
> **The Parties to the Settlement ... shall not seek to introduce** and/or offer the terms of the Settlement Agreement, any statement, transaction or proceeding in connection with the negotiation, execution or implementation of this Settlement Agreement, **any** statements in the notice documents appended to this Settlement Agreement, **stipulations, agreements, or admissions made or entered into in connection with the fairness hearing or any finding of fact or conclusion of law made by the Trial Court, or otherwise rely on the terms of this Settlement, in any judicial proceeding, except insofar as it is necessary to enforce the terms of the Settlement.**

*In Re Diet Drugs,* 369 F.3d 293, 309-310 & n.9 (3rd Cir. 2004) (emphasis added) (vacating preclusive evidentiary rulings of the MDL court).

The Third Circuit Court held that the preclusion language of the settlement agreement must "be strictly construed against those who seek to restrict class members from pursuing individual claims." *Id.* at 308. The Court went on to hold that, because of the quoted language in the settlement agreement, "**neither party can offer evidence regarding the settlement agreement, including evidence regarding its negotiation or implementation.**" *Id.* at 309-310 (emphasis added). Wyeth is not referring to the MDL court's findings on latency "to enforce the terms of the Settlement." Instead, it is improperly attempting to prevent the plaintiffs from litigating an independent claim against Indevus, which was not a party to the settlement. Thus, the only factual basis for Wyeth's argument relies upon inadmissible evidence and should be disregarded.

   **e. Collateral Estoppel Cannot Be A Basis For Fraudulent Joinder.**

As previously stated, the issue of latency is not relevant to the application of the discovery rule in Massachusetts, because the court's findings on latency have no bearing upon the plaintiffs' reasonable reliance on the advice of their physicians. Accordingly, the application of collateral estoppel is not determinative of this case.

15

In any event, regardless of whether Wyeth's argument is regarded as offensive or defensive use of collateral estoppel, the relevant inquiry "is whether the party against whom it is asserted 'lacked full and fair opportunity to litigate the issue in the first action or [whether] other circumstances justify affording him an opportunity to relitigate the issue.' " *Alba v. Raytheon Co.,* 441 Mass. 836, 841-842 (Mass. 2004), quoting *Fidler v. E.M. Parker Co.,* 394 Mass. 534, 541 (1985). *See also*, *Bar Counsel v. Board of Bar Overseers,* 420 Mass. 6, 11-12 (1995) (holding that fact finder should be afforded wide discretion to determine whether it would be fair to apply collateral estoppel offensively).

In this case, a fact finder is likely to hold that it would be grossly unfair to collaterally estop the plaintiffs from litigating the issue of latency. As the Third Circuit held, the "opt-out" provisions of the settlement agreement were intended to protect the rights of class members who became aware of their injuries after the execution of the agreement. *In Re Diet Drugs,* 369 F.3d 293, 308 (3rd Cir. 2004). "In this case, important information for these potential class members included the availability, benefits and disadvantages of the intermediate opt-out. **This opt-out choice raises a significant issue of fairness**… **they can hardly knowingly waive some of their tort rights without a clear notice of what they are waiving.**" *Id.* (emphasis added).

Although the class notice and the settlement agreement describe in considerable detail the preclusive effects of the agreement, there is no mention that by agreeing to the settlement the plaintiffs were effectively waiving their right of action against third parties such as Indevus. In fact, the opposite is true. In particular, the notice of settlement to class members allayed any concerns with respect to the ability of class members to pursue actions against third parties. The notice of the class action settlement explicitly stated that "[t]he rights of Class Members to pursue legal claims against Non-Settling Defendants is **not affected** by the Settlement

Agreement, except that Class Members are required to reduce any judgment they may receive against Non-Settling Defendants in accordance with applicable law …" *See* Ex. 20, Official Court Notice of Nationwide Diet Drug Settlement, p. 10 (emphasis added). Class members were further informed that no part of the deliberations involving the settlement could be used in other proceedings. "[D]ue process considerations counsel against binding absent potential class members to understandings that were not made express in the class notice or settlement agreement." *Id.* at 310.  Any preclusive effect of the settlement or related findings by Judge Bechtel in "implementation" of the settlement, would certainly "affect" those rights in direct contravention of the terms of the class notice.

The plaintiffs here had no reason to litigate the issue of latency at the time of the settlement hearing since they had no symptoms of harm, and since, by its very terms, the Class Action Settlement would <u>not affect</u> in any way their rights to pursue claims against the non-settling defendants.  As plaintiffs pointed out in their opposition to Indevus's motion for summary judgment in *Sawyer*, there was substantial evidence at the time of PTO 1415 that harm from Redux was latent.  However, that evidence was not before the trial judge, and hence, the issue was not effectively litigated.  *See* Ex. 6, Plaintiffs' Opposition at 20-23.

### f. Publicity of Potential Harm Does Not Trigger The Statute of Limitations.

Wyeth's reliance upon cases that have held that generalized publicity has put plaintiffs on notice of their claims is also misplaced.  In each of these cases, none of which is binding authority in Massachusetts, either the publicity disclosed the actual harm, or the plaintiff was aware of an injury when publicity disclosed the cause of the injury.  *See, e.g.*, *United Klans of Am. v. McGovern,* 621 F. 2d 152 (5th Cir. 1980) (civil rights claims disclosed by publicity). Here, plaintiffs allege, and their affidavits demonstrate, that they could not reasonably have

17

discovered that they were harmed until long after any alleged publicity of the potential danger of Redux.

Under the discovery rule, mere notice of *possibility* of injury is not sufficient for a cause of action to accrue. A plaintiff must have reasonable notice of both the injury and the cause of the injury. Even assuming that plaintiffs became aware that they had unwittingly used a potentially dangerous drug, this awareness did not put any of them on notice that they had an actionable claim until they had evidence of appreciable harm. Although the plaintiffs were examined by their physicians repeatedly from 1997 onwards, the first indication of injury did not become manifest until 2001 or 2002. It was only then that each of the plaintiffs acquired the requisite knowledge of ascertainable harm that triggered the limitations countdown. This is far from the clear and convincing evidence Wyeth must put forth to survive plaintiffs' Motion to Remand.

### 3. Class Tolling Applies.

Although the Court need not reach this issue, the fact that the statute of limitations was tolled under the principle of equitable tolling provides an alternative and additional ground for granting plaintiffs' Motion to Remand. *See American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353-354, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983). Despite numerous pages in its brief on the class action tolling issue, Wyeth fails to demonstrate either (1) that Massachusetts does not recognize class action tolling under *American Pipe*; or (2) that plaintiffs' claims would not be covered by any class action filed in Massachusetts or in another jurisdiction.

Under the fraudulent joinder standard, the court "must resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff." *Batoff v. State Farm Ins.*

*Co.,* 977 F. 2d 848, 852 (3rd Cir. 1992), quoting *Boyer v. Snap-On Tools Corp.*, 913 F. 2d 108, 111 (3rd Cir. 1990). Wyeth espouses the opposite standard by seeking to have this Court resolve in its favor any uncertainties or gaps in Massachusetts class-tolling law.

Contrary to Wyeth's arguments, Massachusetts *has* recognized the principles of class action tolling set out in *American Pipe* and *Crown Cork*. As stated by the Appeals Court in *Dicerbo v. Commissioner of the Dept. of Employment and Training*, 54 Mass. App. Ct. 128, n.13 (2002), "as to putative class members who wish to intervene, the statute of limitations is tolled upon the filing of the complaint," citing both *American Pipe* and *Crown Cork*.

The Supreme Judicial Court of Massachusetts has also adopted the holding of *American Pipe* in the context of class actions. *See Baldassari v. Public Finance Trust*, 369 Mass. 33 (1975). In *Baldassari*, the Court specifically stated:

> [W]e think he and others similarly situated may join in a class action to redress that injury and similar injuries caused by the same act or practice. Multiple demands for relief need not be filed on behalf of all the members of the class. If no reasonable tender of settlement is made in response to the first demand, further demands are not likely to serve any useful purpose and are not required. The modern class action is '**designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions**.' *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 550, 94 S.Ct. 756, 765, 38 L.Ed.2d 713 (1974).

*Id.* at 707 (emphasis in original). Accordingly, since Wyeth has not met its burden of proving by clear and convincing evidence that plaintiffs' cannot use class tolling in their claims against Indevus, Wyeth has fraudulently removed this case for that reason as well.

## **CONCLUSION**

As in *Mill-Bern Associates, Inc. v. Dallas Semiconductor Corp.*, 69 F. Supp. 2d 240 (D.Mass. 1999), Wyeth does not contend that the factual allegations of plaintiffs' complaint, if proven, fail to state an actionable claim. Instead, it relies upon evidence outside of the complaint that is either inadmissible or irrelevant. In addition, Wyeth is forced to rely upon unresolved and

complex issues of state law. "It follows that if the Court would not grant summary judgment on the present record, it should not form the slightly more drastic conclusion that the claims against [Indevus] are so meritless that an inference of fraudulent joinder is warranted." *Id.* at 245. For the foregoing reasons, plaintiffs respectfully request that their Motion to Remand be GRANTED.

The Plaintiffs

By their attorneys,

/s/ __Michael S. Appel_____
Edward J. Barshak (BBO # 032040)
Michael S. Appel (BBO # 543898)
Samuel M. Furgang (BBO # 559062)
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114
(617) 227-3030

Samuel W. Lanham, Jr. *(Motion for Pro Hac Vice filed)*
Cuddy & Lanham, P.A.
470 Evergreen Woods
Bangor, ME 04401
(207) 942-2898

Neil D. Overholtz *(Motion for Pro Hac Vice filed)*
Aylstock, Witkin & Sasser, P.L.C.
55 Baybridge Drive
P.O. Box 1147
Gulf Breeze, FL 32562-1147
(850) 916-7450

DATED: June 21, 2004

350754